HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JOSEPH P. TRAUTT, Jr.

    Plaintiff,

  v.

KEYSTONE RV COMPANY, an Indiana corporation,

    Defendant.

Case No. 2:19-cv-00342-RAJ

FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL

## I.    INTRODUCTION

On February 4, 2019, Plaintiff Joseph Trautt, Jr. ("Plaintiff") filed a complaint against Defendant Keystone RV Company ("Defendant" or "Keystone") in King County Superior Court, seeking damages related to a products liability claim pursuant to RCW 7.72.030. Dkt. # 1-2. The action was then removed. Dkt. # 1. The Court heard this matter in a bench trial that began on September 28, 2020 and concluded on October 2, 2020. Dkt. ## 76-80. The trial included testimony of several witnesses and the admission of various exhibits into evidence. The parties also submitted proposed findings of fact and conclusions of law. Dkt. ## 89-90.

This matter now comes before the Court following the presentation of evidence.

ORDER – 1

The Court has considered the evidence, paying careful attention to the testimony of witnesses. Plaintiff offered testimony from the following witnesses: Victoria Chavez, Cynthia Egbert, Alex Trautt, Debra Tesch, Michael Freeman, Ph.D., Phuong Nguyen, Robert Hetler, Catherine Trautt, Thomas Buck, Diedra Stephens, Plaintiff Joseph Trautt, Erick Harada, Russell R. Kinder, MD, Donna Buck, and Jason Thompson, MD. Defendant offered testimony from the following witnesses: Keith Cline, PE and Alan Brown, MD. The Court has further considered the written arguments submitted by counsel for the parties and the authority cited therein.

Pursuant to Federal Rule of Civil Procedure 52, the Court enters the following findings of fact and conclusions of law. The Court need only make brief pertinent findings and conclusions over contested issues. Fed. R. Civ. P. 52 (advisory committee notes to the 1946 amendments). There is no need for over-elaboration of detail or particularization of facts. *Id.* For purposes of organization and clarity, the Court has included some subsidiary conclusions of law with its findings of fact, and vice versa. For the following reasons, the Court finds that Plaintiff has established all of the elements of his WPLA claim for a product not reasonably safe in design and is entitled to certain damages.

## II.    FINDINGS OF FACT

**A. Plaintiff's Fall and Injury in Trailer**

1. On February 15, 2017, Plaintiff purchased a 2017 Passport Elite Travel Trailer (the "Trailer") from Apache Camping Center in Everett, Washington. Dkt. # 53 at 3.
2. Defendant manufactured the Trailer. *Id.*
3. A representative of the Apache Camping Center discussed the Trailer with Plaintiff for approximately 45 minutes. Dkt. # 86 at 209:7-10.
4. The Trailer contained a table that was convertible to a bed. *Id.*

ORDER – 2

5. On May 18, 2017, Plaintiff converted the table to a bed for the first time. *Id.*; Dkt. # 84 at 132:19-133:16.

6. Plaintiff put the table down, placed cushions on top and got a few pillows from the bedroom. Dkt. # 85 at 132:3-5. Plaintiff sat on the bed. Dkt. # 84 at 132:19-133:16. The bed collapsed, and Plaintiff fell. Dkt. # 53 at 3; Dkt. # 84 at 133:18-134:23.

7. Plaintiff's wife, Catherine Trautt, was present and witnessed Plaintiff's fall. Dkt. # 85 at 132:19-134:23. Mrs. Trautt observed that "he went to go sit down, and he swung his legs up, and the whole thing collapsed." *Id.* at 133:1-2. After Plaintiff said it "got [him] in the back," Mrs. Trautt lifted his shirt and observed a triangular mark on his lower back. *Id.* at 134:1-3. Plaintiff decided that he wanted to lie down, so they went into the bedroom. *Id.* at 134:4. Mrs. Trautt noted that Plaintiff appeared "crumpled down" and was in pain. *Id.* at 134:8.

8. Plaintiff was sixty-three years old at the time of the fall. Dkt. # 87 at 94:18. He was not under the influence of drugs or alcohol. Dkt. # 86 at 93:2-11.

**B. Plaintiff's Post-Fall Medical Treatment**

9. The following day, Plaintiff was unable to urinate and suffered significant pain as a result. *Id*. at 136:10-11.

10. The next day, on May 20, 2017, Plaintiff and Mrs. Trautt went to Whidbey Health Medical Center. Ex. 3 at 2.

11. At the hospital, Plaintiff reported back pain, sciatica, and his inability to urinate. *Id.*

12. Plaintiff was diagnosed as having L4-L5 secondary to bilateral L4 spondylosis and L4-L5 neural foraminal stenosis and mild central canal stenosis. *Id.* at 5.

13. Plaintiff was given a Foley catheter and discharged. *Id.*

14. On May 21, 2017, Plaintiff went to the emergency room at UW Valley Medical Center. Ex. 4 at 1.

ORDER – 3

15. The emergency room physician, Dr. Tara Martin, did not suspect cauda equina syndrome. Ex. 5.
16. Plaintiff's orthopedic surgeon, Dr. Jason Thompson, who also evaluated Plaintiff when he presented to the emergency room, noted that Plaintiff exhibited symptoms of "cauda equina syndrome and a bilateral lower extremity weakness" related to a fall. Dkt. # 87 at 92:6; 93:14-94:20-21. Dr. Thompson noted that cauda equina syndrome is a "spectrum of things," and concluded that Plaintiff suffered from a "lesser version" but still had a "compelling amount of neurologic change" that resulted in functional decline and some pain. *Id.* at 95:14-21.
17. To address the cada equina-type syndrome and "severe compression of the nerves" that cause localized pain in Plaintiff's lower back, Dr. Thompson recommended surgery to decompress the affected nerves and stabilize the spine. *Id.* at 96:1-7.
18. On May 30, 2017, Plaintiff underwent his first back surgery, a lumbar fusion, based on Dr. Thompson's recommendation. *Id.* at 10:9-10; 11:19-20.
19. The surgery was deemed successful by Dr. Thompson because it accomplished three goals: (1) it took the pressure off the nerves; (2) it realigned Plaintiff's spine; and (3) it secured his spine so that it would not come out of position again. *Id.* at 100:6-9. Plaintiff was discharged several days later. *Id.* at 100: 19-20.
20. After his surgery, Plaintiff underwent physical therapy pursuant to Dr. Thompson's referral. *Id.* at 102:1-3.
21. Plaintiff attended ten physical therapy sessions and appeared to make progress. Dkt. # 86 at 109:13-16. Although he still had back pain at the end of the therapy, he became "functionally independent [and] had resumed work on his house." *Id.* at 102:3-4.
22. Plaintiff went for seven follow-up appointments at Proliance on June 15, 2017, July 11, 2017, September 6, 2017, January 26, 2018, February 15, 2018, April 28,

ORDER – 4

2018, and May 31, 2018. Dkt. # 87 at 103:3-15.

23. Over the course of these routine appointments to monitor Plaintiff's post-operative progress, Plaintiff demonstrated progression for a period and then began reporting "pain that is different and more intense." *Id.* at 104:5-11.

24. Through X-rays, Dr. Thompson observed that the level just above Plaintiff's lumbar fusion began to show signs of "fairly rapid deterioration." *Id.* at 104:12-15.

25. Based on this observation and Plaintiff's reports of intense pain, Dr. Thompson determined that Plaintiff had developed adjacent segment disease. *Id.* at 105:12-106:6. Dr. Thompson explained that this disease occurs when one level of the spine is stiffened through surgical trauma and the stiffness can cause an adjunct segment to suffer nerve dysfunction or pain. *Id.* at 105:18-106:2.

26. Dr. Thompson recommended a number of nonsurgical treatments for Plaintiff's adjacent segment disease, including steroid shots, physical therapy, and a back brace. *Id.* at 106:14-16.

27. When those treatments failed to address Plaintiff's symptoms, Dr. Thompson recommended a fusion surgery at the second level. *Id.* at 106:16-18.

28. Dr. Thompson confirmed that this surgery was "reasonably necessary given his condition." *Id.* at 107:20-24.

29. On September 4, 2019, Dr. Thompson performed the second surgery. *Id.* at 108:1-2. Following the surgery, Plaintiff's related spine pain decreased but did not completely resolve. *Id.* at 109:1-4.

30. Plaintiff offered testimony by Dr. Michael Freeman, an epidemiologist and expert in causation, specifically, causation of spine injury. Dkt. # 84 at 131-209. Having reviewed the facts of the case, Dr. Freeman testified that Plaintiff's first surgery "stemmed from the fall" and was necessitated by the injury sustained by the fall. *Id.* at 150:2-3. He further opined that the second surgery and subsequent

ORDER – 5

pain resulted from the first surgery in an unbroken causal chain. *Id.* at 150:4-6; 151:24-152:3.

31. Defendant presented Dr. Alan Brown, a spinal surgeon, as a rebuttal witness to dispute Dr. Freeman's causation analysis. Dkt. # 87 at 136-163. Having reviewed Plaintiff's medical record, Dr. Brown testified that the mostly likely cause of Plaintiff's back surgery was not his fall in the Trailer, but rather Plaintiff's prior back pain, which had been worsening. *Id.* at 140:7-11; 146:13-23.

32. Neither Dr. Brown nor Dr. Freeman examined Plaintiff.

33. The Court finds Dr. Freeman's testimony more compelling given, *inter alia*, the testimony of Plaintiff's treating doctors.

34. Despite the fact that Plaintiff had been recommended for surgery in 2012 and suffered various issues since then, his treating doctors over the last five years confirmed that he was not a serious candidate for surgery until shortly after his fall.

C. **Plaintiff's Pre-Fall Back Pain Diagnosis and Treatment**

35. When Plaintiff was twelve years old, he fell off the roof of a barn and injured his back. Dkt. # 86 at 62:8-21. He took a week to recover in bed and had no further back issues until his late thirties. *Id.* at 63:1-12.

36. Beginning in his late thirties, Plaintiff experienced back pain occasionally after physical exertion, such as stacking firewood or playing basketball. *Id.* at 63:11-20; 65:6-13.

37. About eight or nine years before Plaintiff's fall in the Trailer, Plaintiff had ankle surgery and a shoulder replacement, both of which healed with no significant residual pain. *Id.* at 65:18-67:7.

38. Since 2010, Plaintiff was disabled as a result of his neuropathy, a nerve condition caused by Type II diabetes. *Id.* at 182:25-183:3. Plaintiff controls his diabetes

ORDER – 6

with medication. *Id.* at 74:17-18.

39. Following a fall in 2012, a neurologist recommended operating on Plaintiff's back to fuse L4 and L5 in Plaintiff's back. *Id.* at 64:2-11; 67:15-19. Due in part to scheduling issues and Plaintiff's subsequent loss of medical insurance, Plaintiff decided not to pursue the surgery. *Id.* at 68:5-8.

40. Plaintiff followed up with his family doctor, Dr. Westcott, to inquire about the need for surgery. *Id.* at 68:16-23.

41. Dr. Westcott recommended that Plaintiff exhaust other treatments such as shots before performing such an invasive surgery. *Id.*

42. During the period between March and May of 2017—up until the day of his fall—Plaintiff was evaluated and treated by Dr. Russell Kinder, a board-certified anesthesiologist and pain physician, to address Plaintiff's "complaints of back pain radiating to the hip and leg." *Id.* at 127:25-128:3; 129:20-130:2; 130:15-16.

43. Dr. Kinder diagnosed Plaintiff with lumbar radiculopathy, "a painful condition caused by inflammation of nerves, nerve roots coming from the spinal column that typically results in back pain and radiating pain down the legs." *Id.* at 131:5-14.

44. Dr. Kinder ordered a CT exam, which revealed degeneration of joints in the spine and the disc at the L4-5 level, as well as disc protrusion and narrowing around the L5 nerve root. *Id.* at 132: 9-133:8.

45. The exam confirmed Dr. Kinder's diagnosis of lumbar radiculopathy, which he noted was a degenerative long-term condition. *Id.* at 133:6-16.

46. Based on the diagnosis of lumbar radiculopathy and the CT results, Dr. Kinder recommended an epidural steroid injection to treat Plaintiff's pain. *Id.* at 139:1-5.

47. On May 1, 2017, Plaintiff received a steroid for pain relief in his lower back. *Id.* at 197:20-198:5.

48. Plaintiff confirmed that the steroid injection provided instant relief in his lower

ORDER – 7

back. *Id.* at 198:1-5.

49. On May 17, 2017, a day prior to the fall in the Trailer, Plaintiff returned for a follow-up with Dr. Kinder at the Washington Center for Pain Management. Dkt. # 85 at 155:4-7.

50. Plaintiff reported that his back pain had been relieved, but that he experienced pain on a level of ten out of ten radiating down his right leg. Dkt. # 86 at 198:1-5; 198:18-199:1.

51. Dr. Kinder recommended a second epidural steroid injection to address the pain. Dkt. # 86 at 143:16-144:7; Dkt. # 85 at 158:10-159:2; Ex. 144.

52. Dr. Kinder testified that he did not recommend surgery for Mr. Trautt at that time but rather a more conservative treatment, noting that "at this point, [Dr. Kinder] did not believe [Mr. Trautt] to be a good surgical candidate." Dkt. # 86 at 146:12-24.

53. The next day, on May 18, 2017, Plaintiff fell when he attempted to sit on the converted table in the Trailer.

**D. Manufacture of Convertible Table**

54. Plaintiff's expert witness, Robert Hetler, is an expert woodworker with 38 years of experience in building and repairing furniture. Dkt. # 85 at 21:19-22:4. He had never met or spoken with Plaintiff prior to being called to testify. *Id.* at 27:4-18.

55. Mr. Hetler conducted an in-person evaluation of the convertible table inside the Trailer. *Id.* at 29:7-21. He observed the structure of the table and surrounding area, measured the dimensions, and applied pressure to the structure to observe the mechanics. *Id.*

56. Based on his evaluation, Mr. Hetler identified four design defects in the structure of the convertible table that he determined resulted in an unsafe structure. *Id.* at 34:5-19-38:9.

ORDER – 8

57. Specifically, he observed the rounded edges of the table, the splayed shaped in which the "U-shaped seated was wider at the back than on the front," the flexibility of the cabinetry, and the gap between the tabletop's supporting ledgers. *Id.*

58. Because the tabletop was not well-fitted and the legs of the "U" cabinetry were not fastened to the floor, Mr. Hetler explained, the application of pressure would cause the tabletop to tip over. *Id.* The splayed shape of the U-shaped seating, which was wider in the back than in the front allowed the tabletop to slide to one side and fall in at the front edge. *Id.* at 35:13-19. Based on these observations, Mr. Hetler concluded that the tabletop was not properly supported. *Id.* at 36:3-7.

59. Mr. Hetler also testified that the structure could have been improved with "cross-bracing" which would cost between fifty and one hundred dollars to install. *Id.* at 60:19-61:14. He stated that "it would be a very simple fix" to make the table "reasonably secure." *Id.* at 60:25; 61:13-14.

60. Keith Cline, a licensed engineer, served as a rebuttal witness to Mr. Hetler. Dkt. # 87 at 73-74. He disagreed with Mr. Hetler's conclusion that the allegedly defective nature of the table would cause it to tip over under pressure. *Id.* at 74:5-13. Mr. Cline's analysis was based on the photographs related to Mr. Hetler's analysis and the drawings produced by Keystone. *Id.* at 74:1-4. Mr. Cline did not conduct any physical testing or assessment of the convertible tabletop in Plaintiff's trailer or conduct any in-person observation. The Court finds that Mr. Hetler's physical examination was more compelling than Mr. Cline's review of photographs and drawings.

### III.    CONCLUSIONS OF LAW

1. Jurisdiction is proper in this Court under 28 U.S.C. § 1332 because Plaintiff does not share citizenship with Defendant and the amount in controversy exceeds $75,000.

ORDER – 9

2. Venue is proper in this Court under 28. U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this judicial district.

3. Plaintiff's claim arises under Washington's Products Liability Act ("WPLA"), RCW 7.72.030. Dkt. # 1-2 at 3.

4. Pursuant to the WPLA, "[a] product manufacturer is subject to liability to a claimant if the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe as designed or not reasonably safe because adequate warnings or instructions were not provided." RCW 7.72.030(1). A product manufacturer is strictly liable to claimant "if the claimant's harm was proximately caused by the fact that the product was not reasonably safe in construction." RCW 7.72.030(2).

5. Under this statute, Plaintiff has the burden of proving the following three elements: (1) the manufacturer's product (2) was not reasonably safe as designed, manufactured, or because adequate warnings or instructions were not provided, and (3) it caused harm to the plaintiff. *Thongchoom v. Graco Children's Prod., Inc.*, 71 P.3d 214, 217 (Wash. Ct. App. 2003), *review denied* 151 Wash.2d 1002, 87 P.3d 1185; RCW 7.72030.

**A. Defendant was the manufacturer**

6. The Court finds that Defendant Keystone RV Company is the manufacturer of the Trailer, including the convertible table, or "relevant product" under the WPLA.

7. Under the WPLA, a manufacturer includes "a product seller who designs, produces, makes, fabricates, constructs, or remanufactures the relevant product or component part of a product before its sale to a user or consumer." RCW 7.72.010(2). The "relevant product" refers to the product which gave rise to the product liability claim. RCW 7.72.010(3).

8. Defendant admits that it manufactured the Trailer, which includes the convertible table. Dkt. # 53 at 3. The first element of Plaintiff's claim is thus satisfied.

ORDER – 10

**B. The convertible table was not reasonably safe**

9. Plaintiff alleges that the convertible table was not reasonably safe in construction, in design, and because adequate warnings or instructions were not provided regarding the conversion.

10. To establish that a product is not reasonably safe in construction, a plaintiff must establish that (1) "the product deviated in some material way from the design specifications or performance standards of the manufacturer," or (2) "deviated in some material way from otherwise identical units of the same product line." RCW 7.72.030(2)(a). Here, Plaintiff provides no evidence that the table at issue deviated in some material way from the design specifications or performance standards of the manufacturer or from other identical units. Mr. Hetler was Plaintiff's only witness who testified regarding a defect. He did not address Keystone's design specifications or performance standards or provide any information regarding other identical units manufactured by Keystone. No such evidence of deviation from other identical units or from design specifications was presented. The Court therefore concludes that Plaintiff has failed to meet his burden to establish that the convertible table was not reasonably safe in construction.

11. To establish that a product is not reasonably safe in design, the moving party must satisfy (1) a risk-utility analysis, or (2) a consumer expectation standard. *Bruns v. PACCAR, Inc.*, 890 P.2d 469, 474 (Wash. Ct. App. 1995). Under the risk-utility analysis, Plaintiff must show that "at the time of manufacture, the likelihood and seriousness of harm caused by the product outweighed the manufacturer's cost and opportunity to design a product that would not have caused that harm." *Id.*; RCW 7.72.030(1)(1). Under the consumer expectation standard, Plaintiff must establish that "the product was unsafe to an extent beyond that which would be contemplated by the ordinary consumer." RCW 7.62.030(3). In applying this

ORDER – 11

test, a plaintiff must demonstrate not merely that the product caused harm, but rather that the product causing harm was not reasonably safe. *See Thongchoom*, 71 P.3d at 218.

12. The Court finds that Plaintiff has met his burden here under both tests by a preponderance of evidence.

13. First, the Court finds sufficient and compelling evidence demonstrating that the likelihood and seriousness of harm were significant based on the cumulative defects identified by Mr. Hetler. The Court finds that Defendant had the opportunity to design the convertible bed so that it would not have caused harm by installing cross-bracing. The Court finds that cost of designing the table so that it would not have caused harm was low—approximately $50 through $100. The Court thus finds that the likelihood and seriousness of harm caused by the converted bed falling when it was used as intended—when a person sits or lays down on it—outweighs the manufacturer's cost and opportunity to design a product that would not have caused harm. The risk-utility analysis is thereby satisfied.

14. Second, the Court finds that the consumer expectation standard has been met, that is, "the product was unsafe to an extent beyond that which would be contemplated by the ordinary consumer." RCW 7.62.030(3). The product was being used as intended—as a bed. A bed that does not properly support the weight of an adult and collapses when a person sits or lays on it is unsafe well beyond that which would be contemplated by the ordinary customer. Having satisfied both tests, Plaintiff has established the second element of his claim that the convertible table was not reasonably safe in design.

15. The Court concludes that Plaintiff has not established that the convertible table was not reasonably safe because adequate warnings or instructions were not provided with the table-bed conversion. Plaintiff did not provide sufficient

ORDER – 12

evidence that a lack of warning or instructions led to the fall. Plaintiff testified that he declined a demonstration on how to convert the table to a bed when he purchased the Trailer because he considered it to be a simple mechanism. Dkt. # 86 at 209:13-22. Moreover, based on the description of the incident and cause of the injury, there is no allegation that Plaintiff could have done anything differently if he had been provided with instructions. The Court finds that Plaintiff has not met his burden to establish that the convertible table was not reasonably safe because adequate warnings or instructions were not provided.

**C. The defects were the proximate cause of Plaintiff's injuries**

16. Proximate cause is generally a question of fact that consists of two elements: a cause in fact, or but-for cause, and legal causation. *Almquist v. Finley Sch. Dist. No. 53*, 57 P.3d 1191, 1197 (Wash. Ct. App. 2002). Cause in fact is based on the physical connection between an act and injury. *Id*. It requires "a direct unbroken sequence between some act and the complained of event." *Id*. The second element, legal causation, involves policy considerations regarding how far the consequences of a defendant's act should extend. *Id.*

17. The Court finds sufficient evidence that Defendant's product caused harm to the Plaintiff, which directly resulted in back pain requiring surgery, physical therapy, an additional surgery, and further treatment. Defendant's contention that Plaintiff's pre-existing back pain was the more likely cause for the surgery than his fall is simply unconvincing.

18. Plaintiff was not a candidate for surgery at the time of his fall. The steroid injection he received prior to the fall successfully eliminated his back pain. A second steroid injection was scheduled to address his leg pain.

19. Plaintiff's fall from the convertible table resulted in immediate pain that caused him to go to the hospital. His doctor's evaluations, diagnoses, and reports of his ongoing pain and physical challenges support the contention that his fall was the

ORDER – 13

but-for cause of his pain requiring surgery and subsequent treatment. The Court concludes that the surgery was necessitated by the injury Plaintiff sustained from his fall from the convertible table.

20. Although his second spinal surgery occurred over two years later, the medical testimony of Dr. Thompson, Plaintiff's treating orthopedic surgeon, confirms that it was necessary to address the pain caused by the first surgery. This is supported by the testimony of Dr. Freeman, an epidemiologist and causation expert. Dkt. # 84 at 131-209.

21. The Court further concludes that Plaintiff did not fail to mitigate damages by acting unreasonably in deciding on treatment, resulting in his second surgery. An injured plaintiff has a duty to use such means as are reasonable under the circumstances to mitigate damages. *Young v. Whidbey Island Bd. of Realtors*, 638 P.2d 1235, 1237 (Wash. 1982). The "party alleging that the damages should have been mitigated has the burden of proof." *Sutton v. Shufelberger*, 643 P.2d 920, 923 (Wash. Ct. App. 1982). Plaintiff completed ten physical therapy sessions following his first surgery, as recommended by his doctor. Although Plaintiff did not complete the total number of sessions recommended, his physical therapist's supervisor confirmed that, at the time of his discharge from physical therapy, Plaintiff was prepared to transition to his home exercise program and "he had the right tools to continue for function." Dkt. # 86 at 113:6-13. There is no evidence that Plaintiff acted unreasonably in deciding on treatment to demonstrate a failure to mitigate damages.

22. The Court thereby finds that Plaintiff has established proximate cause by a preponderance of evidence.

23. The Court concludes that Plaintiff has satisfied all three elements of his WPLA claim and is entitled to certain damages.

**D. Reasonableness and Necessity of Medical Treatment and Bills**

ORDER – 14

24. Under Washington law, "[a] plaintiff in a negligence case may recover only the reasonable value of medical services received, not the total of all bills paid." *Patterson v. Horton*, 929 P.2d 1125, 1130 (Wash. Ct. App. 1997).  A court may not rely "on medical bills as proof of medical costs without requiring the plaintiff to show that the bills were reasonable and the treatment was necessary." *Id*. at 1126-27.  A plaintiff has the burden of proving that the medical treatment and bills were both necessary and reasonable. *Id*. at 1130.  "[M]edical records and bills are relevant to prove past medical expenses only if supported by additional evidence that the treatment and the bills were both necessary and reasonable." *Id*.

25. The Court concludes that Plaintiff established that the medical treatment from UW Valley Medical Center, Proliance Orthopedic Associates, and Harada Physical Therapy was both necessary and reasonable.  Specifically, the Court makes its conclusions based on the testimony of Dr. Kinder, Dr. Thompson, and Mr. Harada, each of whom testified as to the necessity and reasonability of treatment provided at these facilities.

26. The Court next finds that the medical bills from UW Valley Medical Center, Proliance Orthopedic Associates, and Harada Physical Therapy were reasonable and necessary.  This finding is based on testimony of billing professionals at each institution: (1) Dierdra Stephens, a patient financial services manager at UW Valley Medical Center, confirmed that the facility has "comparable pricing information from other regional organizations" and "falls just under the 75th percentile . . . for national pricing overall" Dkt. # 86 at 13-19; (2) Victoria Chavez, a billing coordinator at Orthopedic Associates confirmed that the amounts charged to Plaintiff were reasonable and customary to all patients seen at Proliance, Dkt. # 84 at 64:21-65:1; and (3) Erick Harada, owner of Harada Physical Therapy, confirmed that the cost of therapy was market-based and in the median range as compared with similar facilities, Dkt. # 86 at 114:21-115:12.

ORDER – 15

27. The Court concludes that Plaintiff has failed to establish the reasonability and necessity of treatment provided at Whidbey Health Medical Center and Skagit Northwest Orthopedics, as required under Washington law. *See* 929 P.2d at 1130. Although Plaintiff offered testimony from billing professionals from these institutions to address the reasonability of cost, these individuals were not able to testify as to the reasonability and necessity of treatment. Absent further evidence supporting the reasonability of treatment, Plaintiff has failed to meet his burden with respect to medical expenses related to these two facilities. *See id.* at 1131; *Berger v. Sonneland*, 26 P.3d 257, 267 (Wash. 2001) (holding that "[m]edical facts must be proved by expert testimony unless they are observable by laypersons and describable without medical training").

28. The Court finds that Plaintiff is entitled to economic damages in the total amount of $253,682. This is based on medical expenses from UW Valley Medical Center in the amount of $230,000; Proliance Orthopedic Associates in the amount of $21,571; and Harada Physical Therapy in the amount of $2,111. See Dkt. # 88 at 21:22-24.

**E. Non-Economic Damages**

29. Non-economic damages refer to subjective, nonmonetary losses, including pain, suffering, inconvenience, mental anguish, disability, emotional distress, and loss of companionship, among other things. RCW 4.56.250(1)(b).

30. Plaintiff seeks to recover $100,000 per year for 20.5 years (his remaining life expectancy) in compensation for the pain, loss of enjoyment of life, mental anguish, disability, and emotional distress he has and will likely continue to suffer as a result of his injury.

31. The Court finds that Plaintiff has a remaining life expectancy of 20.5 years as of the date of the injury. Ex. 38; Dkt. # 88 at 22:14-17.

32. The Court finds that Plaintiff had been suffering from back and leg pain

ORDER – 16

intermittently for years prior to the injury at issue here. Plaintiff had been in treatment to address the pain, which had been worsening. Dkt. # 86 at 135:1-9. He regularly used marijuana for the pain, Dkt. # 85 at 202: 22-24, as well as pain medication, Dkt. # 86 at 134. Plaintiff was scheduled to have a second steroid shot to address severe pain in his leg prior to his fall.

33. The Court finds that Plaintiff's injury limited his physical abilities and range of activities. The injury caused him constant and ongoing pain, mental anguish, and emotional distress. Testimony provided by Plaintiff's wife, Catherine Trautt, his son, Alex Trautt, and friends, Donna and Tom Buck, confirms the physically disabling and emotionally distressing impacts of the injury on Plaintiff. See Dkt. # 84 at 106-107, 109; Dkt. # 85 at 352, 411; Dkt. # 86 at 443-44; Dkt. # 87 at 699-700, 704-705.

34. Based on these considerations, the Court awards Plaintiff $1,332,500 in non-economic damages based on a calculation of $65,000 per year for 20.5 years.

## IV.   CONCLUSION

For the foregoing reasons, the Court finds in favor of Plaintiff. As a direct and proximate cause of his injury, Plaintiff is entitled to the following:

Medical Expenses: $253,682

Non-economic Damages: $1,332,500.

**Total Damages**: $1,586,182.

The Clerk shall enter judgment for Plaintiff.

DATED this 11th day of August, 2021.

The Honorable Richard A. Jones
United States District Judge

ORDER – 17